UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BROADRIDGE FINANCIAL SOLUTIONS, INC.,

                                Plaintiff,

                    - against -

TIMOTHY SCHAFFER,

                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

22 Civ. _____

**<u>VERIFIED COMPLAINT</u>**

      Plaintiff Broadridge Financial Solutions, Inc. ("Broadridge" or "Plaintiff"), by its attorneys Epstein Becker & Green, P.C., as and for its Complaint, alleges as follows:

      1.     This action arises out of the conduct of Defendant Timothy Schaffer ("Schaffer"), a former Broadridge employee who recently resigned from Broadridge to join BetaNXT, Broadridge's direct competitor in the provision of wealth management products and services. Over the course of his employment, Schaffer, who was employed by Broadridge as its Executive Vice President ("EVP"), Strategic Pricing, had access to Broadridge's highly confidential and proprietary pricing strategies and strategic investment priorities. He also had access to confidential and proprietary information related to Broadridge's Global Technology and Operations business, as well as the technical roadmap for Broadridge's products, confidential client lists, and prospect lists. Schaffer led Broadridge's pricing, costing, and profitability aspects of its partnership with UBS Group AG ("UBS") on a next generation wealth platform. The confidential and proprietary information that Schaffer was provided access would be invaluable to Broadridge's competitors, particularly BetaNXT.

2.      In seeking to enforce its Restrictive Covenant, Broadridge does <u>not</u> seek to stop Schaffer from working at BetaNXT.  Instead, in accordance with his Restrictive Covenant, Broadridge seeks only to stop Schaffer from working in a role at BetaNxt that is similar to the position he held at Broadridge, namely in a role in which he has responsibility for pricing and competitive analysis of products.

3.      Schaffer's decision to accept employment with BetaNXT is a brazen violation of his Restrictive Covenant agreement to refrain from accepting employment with a Broadridge competitor in a similar role for a period of one year after resigning from Broadridge.  Schaffer agreed to the Restrictive Covenant when he accepted valuable restricted stock awards <u>every</u> year from 2007 through 2022.  A copy of the RSU Agreement and Restrictive Covenant from 2007 is attached hereto as Exhibit 1.  A copy of the RSU Agreement and Restrictive Covenant from 2022 is attached hereto as Exhibit 2.  Schaffer signed similar agreements each year from 2008 through 2021.

4.      After accepting Broadridge's substantial consideration for agreeing to the Restrictive Covenant each year from 2007 through 2022, at an approximate market price at time of the grant of $350,000, Schaffer now seeks to renege on his part of the bargain by voluntarily resigning and accepting employment with BetaNXT in clear violation of the Restrictive Covenant.

5.      Schaffer's violation of the Restrictive Covenant will cause Broadridge to suffer substantial economic damages, as well as irreparable harm that cannot be remedied by money damages alone.  Accordingly, Broadridge commenced this action to recover all losses caused by Schaffer's unlawful conduct, including equitable relief to prevent Schaffer from violating his Restrictive Covenant by commencing employment with a direct competitor of Broadridge and

utilizing Broadridge's confidential information, causing Broadridge to suffer further irreparable harm.

## PARTIES

6.      Broadridge Financial Solutions, Inc. is a publicly-traded company listed on the New York Stock Exchange, incorporated in Delaware with its principal place of business in Lake Success, New York.  Broadridge employs approximately 2,400 employees in the State of New York and approximately 14,000 employees worldwide.

7.      Broadridge is a leading global corporation in which its wealth industry solutions are a core and strategic business.  Broadridge's solutions enable wealth managers to drive their business to the next level while mutualizing investments in technology, innovation and security. The solutions can streamline all aspects of wealth management services, including account management, fee management and client on-boarding. Broadridge also offers broker-desktop solutions which provide a user-friendly interface for accessing the platform solutions.

8.      Defendant Timothy Schaffer is an individual whose last known address is in West Caldwell, New Jersey.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as Broadridge is a citizen of the State of Delaware with its principal place of business in Lake Success, New York and Defendant Schaffer is a citizen of the State of New Jersey.

10.      The amount in controversy in this action exceeds $75,000 as Schaffer received well in excess of $75,000 in exchange for his promise not to compete, and Broadridge will suffer irreparable harm should he breach that promise.

11.      This Court has personal jurisdiction over Schaffer.  Any actions taken by Schaffer, even if initiated at times outside of New York, were expressly aimed at New York, with knowledge

that they would cause harm in New York. Furthermore, Schaffer has accepted an offer of employment with BetaNXT, a corporation located in the State of New York. These purposeful actions constitute at least minimum contact with New York such that the maintenance of this suit in this Court does not offend traditional notions of fair play and substantial justice. This Court's personal jurisdiction over Schaffer is further established by virtue of his express consent to the federal courts for the Eastern District of New York serving as the exclusive forum for disputes, as set forth in the Restricted Stock Unit Grant Award Agreement described *infra*.

12. Venue is proper pursuant to 28 U.S.C. § 1391 because Broadridge's principal place of business is in New York, a substantial part of the events or omissions giving rise to Broadridge's claim occurred in this judicial district, and Broadridge and Schaffer contractually agreed to venue (and choice of law) in the jurisdiction of the "federal courts for the United States for the Eastern District of New York[.]" (*See* Exhibit 2, at ¶ 18).

## FACTS

**A.  BetaNXT is a Direct Competitor of Broadridge**

13. Broadridge is a global leader in the wealth management field in which it offers its clients products that provide the ability to build their practice with leading data-driven, targeted marketing and customizable brand-building tools.

14. Through its Global Technology and Operations ("GTO") business segment, Broadridge provides products, services and solutions to clients the capital market, wealth, and asset management space.

15. Broadridge provides its wealth management clients with several products and services, including in the areas of artificial intelligence, data management, and web-based information access for advisors and investors.

16.     Broadridge's Wealth Management Advisor Platform includes a variety of wealth management products and services, including but not limited to, BPS, Revport, Onboarding, EISL, AdvisorStream, Advisor Resource Center, and Distributed Marketing Solution.

17.     BetaNXT is a company located in New York, New York.

18.     BetaNXT offers wealth management solutions products that directly compete with the wealth management solutions products offered by Broadridge.  Thus, BetaNXT is a direct competitor of Broadridge.

19.     BetaNXT markets three wealth management solutions products, each of which competes with Broadridge's Wealth Management Advisor platform:

    a.  BetaNXT's BETA product is a wealth management solution for transaction processing, books and records that is marketed to entities in the capital market, wealth, and asset management space. Specifically, BetaNXT's BETA product is designed and marketed as a processing solution that supports wealth management firms;

    b.  BetaNXT's Digital Investor product is also a wealth management investor platform offered by BetaNXT to clients in the capital market, wealth, and asset management space; and

    c.  BetaNXT's Maxit product provides cost basis accounting and tax reporting capabilities.

20.     Broadridge and BetaNXT regularly bid against each other for clients in the wealth management space.

21.     Schaffer knows the bidding structure for all of the Broadridge products that compete with BetaNXT, and, therefore, if he is allowed to continue employment with BetaNXT

in a similar position to the one he most recently held with Broadridge, it will place Schaffer and BetaNXT in an unfair competitive advantage vis-à-vis Broadridge.

22. Schaffer also has intimate knowledge of Broadridge's confidential pricing metrics, pricing methods, and tiered pricing, and, therefore, if he is allowed to continue employment with BetaNXT in a similar position to the one he most recently held with Broadridge, it will place Schaffer and BetaNXT in an unfair competitive advantage against Broadridge.

**B.    Schaffer's Employment With Broadridge and His Knowledge of Broadridge Confidential Information**

23. Schaffer commenced his employment with Broadridge in or about August 2005 as Senior Director, Pricing.

24. In April 2017, Schaffer was promoted to Vice President, Pricing and he was promoted again in September 2019.

25. From approximately September 2019 until November 2022, Schaffer was employed by Broadridge as its EVP, Strategic Pricing.

26. As EVP, Strategic Pricing, Schaffer had primary responsibility for pricing and developing pricing strategies for all of Broadridge's wealth management products, including but not limited to, Broadridge's Wealth Management Advisor Platform.

27. As EVP, Strategic Pricing, Schaffer had responsibility for Broadridge's confidential pricing metrics, pricing methods, and tiered pricing.

28. Many of the contracts entered into between Broadridge and its clients are for several years, and, therefore, Broadridge's pricing information, of which Schaffer has intimate knowledge, remains relevant for several years.

29.      Schaffer also had responsibility for negotiating contractual renewals with clients, and, therefore, he possesses intimate knowledge about concessions that Broadridge has made to clients in the wealth management product space.

30.      In addition to the above, Schaffer also had responsibility for implementation services for Broadridge's Wealth Management Advisor Platform, including the supply, configuration, and programming of Broadridge's products.

31.      In his role as EVP, Strategic Pricing, Schaffer worked directly with clients and potential clients in which those potential clients were also considering BetaNXT's wealth management products.

32.      Schaffer's own LinkedIn profile confirms these responsibilities in which Schaffer admits that he had an "[e]xecutive level role leading the pricing and deal strategy process … as well as new products as services for [the] GTO" business unit.  A screenshot of Schaffer's LinkedIn profile is attached hereto as Exhibit 3 (emphasis added).

33.      He also states on his LinkedIn profile that he was responsible for developing and implementing "product portfolio value based pricing strategies[.]"  (*Id.*) (emphasis added).

34.      Schaffer also admits on his LinkedIn profile that he was responsible for setting the "vision, prioritization, and roadmap for global pricing initiatives, including pricing models and process improvements."  (*Id.*) (emphasis added).

35.      As an EVP, Schaffer was responsible for understanding all aspects of Broadridge's Wealth Management Advisor Platform, and communicating with the sales team regarding the relative strengths and weaknesses of the platform as compared to competitive products, including, specifically, BetaNXT's wealth management products.

36.     Thus, Schaffer had intimate knowledge of Broadridge's strategies to compete against BetaNXT in the wealth management space.

37.     Indeed, Schaffer was provided with highly confidential pricing strategies for Broadridge's wealth management products in order to compete directly with BetaNXT.

38.     In addition to all of the above confidential information, Schaffer led Broadridge's pricing and cost structure strategies for its wealth management products and was responsible for developing strategies for the enhancement of those products.

39.     Moreover, Schaffer had responsibility for developing confidential discounting strategies and models, as well as concession strategies aimed at retaining clients and not losing those clients' business to competitors such as BetaNXT.

40.     If Schaffer is allowed to continued employment with BetaNXT in a similar position to the one he held with Broadridge, it would give BetaNXT and Schaffer an unfair competitive advantage over Broadridge because Schaffer not only has intimate knowledge of Broadridge's confidential pricing information and pricing strategies but knows Broadridge's strategies for competing directly against BetaNXT.

41.     In addition to Schaffer's knowledge of Broadridge's confidential pricing information and strategies, Schaffer also had access to confidential and proprietary information related to Broadridge's products and clients within its GTO business segment, including but not limited to, confidential client lists, and prospect lists.

42.     In addition to having intimate knowledge of its pricing and pricing strategies, Schaffer also had detailed knowledge of Broadridge's product strategy for the Wealth Management Advisor Platform.

43.     Schaffer's knowledge of Broadridge's highly confidential pricing strategies and strategic plans respecting the Wealth Management Advisor Platform would be particularly damaging in the hands of any competitor of Broadridge, but it would be most damaging in the hands of BetaNXT.

44.     As one example of Schaffer's knowledge of Broadridge's product strategy and pricing, Schaffer led Broadridge's pricing, costing, and profitability aspects of its partnership with UBS Group AG ("UBS") on a next generation wealth platform.

45.     Schaffer also developed the pricing and pricing strategies for the solicitation of new clients and has specific knowledge of the current pricing for any clients upcoming for the renewal of contracts.

**C.      Schaffer's Obligations to Broadridge Under RSU Agreements**

46.     In order to reward and retain employees, Broadridge has an Omnibus Stock Award Plan to award restricted stock units to its employees.  Schaffer participated in that plan in every year from 2007 through 2022 and received restricted stock unit awards.  Those awards were governed by a Restricted Stock Unit Agreement (the "RSU Agreement").

47.     The RSU Agreement incorporates a separate Restrictive Covenant agreement by reference, which Schaffer agreed to in return for the RSU award.  (*See* Exhibit 2,  at ¶ 10). Schaffer most recently acknowledged and agreed to the Restrictive Covenant on October 31, 2022.

48.     Between December 2007 and October 2022, Schaffer accepted restricted stock awards on at least sixteen (16) separate occasions, and on each occasion he agreed to be bound by a restrictive covenant:

a.      On December 3, 2007, Schaffer accepted 950 stock units in exchange for agreeing to be bound by a restrictive covenant;

      b.      On December 18, 2008, Schaffer accepted 800 stock units in exchange for agreeing to be bound by a restrictive covenant;

      c.      On October 20, 2009, Schaffer accepted 800 stock units in exchange for agreeing to be bound by a restrictive covenant;

      d.      On October 12, 2010, Schaffer accepted 807 stock units in exchange for agreeing to be bound by a restrictive covenant;

      e.      On October 19, 2011, Schaffer accepted 836 stock units in exchange for agreeing to be bound by a restrictive covenant;

      f.      On October 11, 2012, Schaffer accepted 752 stock units in exchange for agreeing to be bound by a restrictive covenant;

      g.      On October 29, 2013, Schaffer accepted 675 stock units in exchange for agreeing to be bound by a restrictive covenant;

      h.      On October 8, 2014, Schaffer accepted 606 stock units in exchange for agreeing to be bound by a restrictive covenant;

      i.      On October 6, 2015, Schaffer accepted 385 stock units in exchange for agreeing to be bound by a restrictive covenant;

      j.      On October 11, 2016, Schaffer accepted 241 stock units in exchange for agreeing to be bound by a restrictive covenant;

      k.      On October 16, 2017, Schaffer accepted 295 stock units in exchange for agreeing to be bound by a restrictive covenant;

      l.      On November 1, 2018, Schaffer accepted 147 stock units in exchange for agreeing to be bound by a restrictive covenant;

m.      On October 17, 2019, Schaffer accepted 196 stock units in exchange for agreeing to be bound by a restrictive covenant;

n.      On October 19, 2020, Schaffer accepted 235 stock units in exchange for agreeing to be bound by a restrictive covenant;

o.      On October 27, 2021, Schaffer accepted 219 stock units in exchange for agreeing to be bound by a restrictive covenant; and

p.      On October 31, 2022, Schaffer accepted 217 stock units in exchange for agreeing to be bound by a restrictive covenant.

49.     Each year Schaffer received stock valued between approximately $11,864 and $36,358 in connection with the RSU Agreement and in return for the restrictive covenants.

50.     In total, Broadridge granted Schaffer, and Schaffer accepted, approximately 7,500 stock units, having an approximate market price at time of the grant of $350,000, in exchange for Schaffer's agreement to a one-year non-compete and other covenants within the Restrictive Covenant.

51.     Thus, in exchange for his reasonable one-year Restrictive Covenant, Schaffer received consideration equal to an amount substantially more than one year of salary.

52.     With each grant of restricted stock, Schaffer reaffirmed his agreement to abide by the terms of the Restrictive Covenant. *See* Exhibits 1, 2.

53.     Schaffer accepted the RSU awards by electronically acknowledging the provisions within the Restrictive Covenant in exchange for the restricted stock units as consideration. Attached hereto as Exhibit 9 is a true copy of one of Schaffer's acknowledgements of the RSU.

54.     The Restrictive Covenant states, and Schaffer agreed, that for a period of one year following his resignation from Broadridge, Schaffer is prohibited from working for a competitor

in the same or similar capacity to his employment with Broadridge.  Specifically, paragraph 1 of

the Restrictive Covenant states:

> **During the period that I am a Broadridge employee and ending twelve months after the date I cease to be a Broadridge employee for any reason whatsoever (the "Non-Competition Period"), I will not,** provided that I have been a Broadridge employee for at least six months, **directly or indirectly, become or be interested in, employed by, or associated with in any capacity, any person, corporation, partnership or other entity whatsoever (a "Person") engaged in any aspect of Broadridge's businesses** or businesses Broadridge has formal plans to enter on the date I cease to be a Broadridge (the "Termination Date"), **in a capacity which is the same or similar to any capacity in which I was involved during the last two years of my employment by Broadridge**.  The restrictions set forth in this paragraph 1 shall apply only the Broadridge businesses existing at the time my employment terminates and businesses that Broadridge has formal plans to enter with which I was involved.  After the Termination Date, however, nothing shall prevent me from owning, as an active investor, securities of any competitor of Broadridge which is listed on a national securities exchange.  Furthermore, after the Termination Date, I may become employed in a separate, autonomous division of a corporation provided such division is not a competitor of Broadridge.

(Ex. 2, Restrictive Covenant, at ¶ 1) (emphasis added).

55.     Schaffer also agreed not to disclose Broadridge's confidential information.

Specifically Paragraph 2 of the Restrictive Covenant states, in pertinent part:

> During and after my employment by Broadridge, I will not use, or disclose to any Person any confidential information, trade secrets and proprietary information of Broadridge, its vendors, licensors, marketing partners or clients, learned by me during my employment and/or any of the names and addresses of clients of Broadridge. I acknowledge that I am prohibited from taking any confidential, proprietary or other materials or property of Broadridge with me upon termination of my employment.

(*Id.* at ¶ 2).

56.     In Paragraph 3, Schaffer further agreed:

> During the Non-Competition Period, I shall not, on my behalf or on behalf of any other Person, directly or indirectly, solicit, contact, call upon, communicate with or attempt to communicate with any Person which was a client or a bona fide prospective client of Broadridge before the

> Termination Date to sell (license or lease) any software or service competitive or potentially competitive with any software or services sold, licensed, leased, provided or under development by Broadridge during the two-year period prior to the Termination Date, provided that the restrictions set forth in this paragraph 3 shall only apply to clients or bona fide prospective clients of businesses of Broadridge with which I was involved.

(*Id.* at ¶ 3).

57.     Schaffer acknowledged that any violation by him of the "foregoing covenants not to compete, not to disclose, not to solicit and not to hire will cause irreparable harm to Broadridge." He further acknowledged that Broadridge would be entitled to "**an injunction enjoining and restraining [Schaffer] from performing, and continuing in the performance of, any such violation**." *Id.* at ¶ 6 (emphasis added).

**D.     Schaffer's Resignation And Intention To Breach His Restrictive Covenant**

58.     On or about November 14, 2022, Schaffer informed Broadridge of his intention to resign from Broadridge on November 25, 2022.

59.     Following verbal notice of his resignation, Schaffer sent an e-mail on November 14, 2022 in which he submitted his "formal resignation from Broadridge." Schaffer also stated that his "last day will [be] November 25, 2022.  However, there is some flexibility if a little longer period is required."  A copy of Schaffer's resignation e-mail is attached hereto as Exhibit 4.

60.     Upon discussing his intention to resign, Schaffer informed Broadridge of his intention to join BetaNXT in a substantially similar position to the one he held with Broadridge.

61.     Specifically, Schaffer informed Broadridge that he had accepted a position with BetaNXT as its Vice President of Pricing.

62.     Shortly thereafter, Broadridge reminded Schaffer of his obligations to Broadridge under the Restrictive Covenant and that his acceptance of employment with BetaNXT would violate his non-compete obligations to Broadridge.

63.     Prior to his last day of employment, Broadridge again reminded Schaffer about his obligations under the Restrictive Covenant, and Schaffer responded that BetaNXT had instructed Schaffer to seek the advice of his own counsel regarding his non-compete and other obligations under the Restrictive Covenant.

64.     Upon information and belief, Schaffer ignored the advice of BetaNXT to seek the advice of his own counsel and accepted BetaNXT's offer of employment in violation of his Restrictive Covenant with Broadridge.

65.     Upon learning of Schaffer's efforts to join BetaNXT in breach of his restrictive covenants, Broadridge sent a letter to Schaffer reminding him of his continuing obligations to Broadridge under the Restrictive Covenant and demanding that he confirm by December 2, 2022 that he had rescinded his acceptance of employment with BetaNXT.  A copy of Broadridge's November 28, 2022 letter to Schaffer is attached as Exhibit 5.

66.     Schaffer's employment with BetaNEXT as a Senior Vice President, Pricing Strategy and Solutions would violate the Restrictive Covenant with Broadridge that prohibits Schaffer from accepting employment with a competitor in a capacity that is the same or similar to any capacity in which Schaffer was involved during the last two years of my employment by Broadridge.  (Exhibit 2, Restrictive Covenant, at ¶ 1).

67.     On December 2, 2022, counsel for Schaffer responded to Broadridge's November 28 letter to state only that he had just been retained and requested additional time to respond to the letter.  In response to Broadridge's question as to whether Schaffer had commenced employment with BetaNXT, Schaffer's counsel responded: "I honestly do not know."  A copy of the December 2, 2022 e-mail correspondence is attached hereto as Exhibit 6.

14

68.     Later on December 2, 2022, Broadridge requested that Schaffer's counsel confirm by Monday morning that Mr. Schaffer had not yet started working at BetaNXT.  On December 5, 2022, Schaffer's counsel responded and stated: "I finally spoke with my client and he advised that he started work on November 28th."  A copy of the December 2-5, 2022 e-mail correspondence is attached as Exhibit 7.

69.     Despite BetaNXT's instruction to Schaffer that he seek advice of his own counsel regarding the Restrictive Covenant, Broadridge's instruction to Schaffer that it intended to enforce the non-compete if he commenced employment with BetaNXT, and Broadridge's November 28, 2022 letter to Schaffer, Schaffer nevertheless ignored these instructions and commenced employment with BetaNXT on November 28, 2022.

70.     Schaffer did not disclose the fact that he had started employment with BetaNXT until December 5, 2022.  (*See* Exhibit 7).

71.     Thus, despite being in receipt of Broadridge's November 28, 2022 letter, Schaffer continued to provide services from BetaNXT in violation of his non-compete with Broadridge and did not disclose to Broadridge until December 5, 2022 that he had been providing services for BetaNXT for the entire previous week despite knowing it was in violation of his Restrictive Covenant.

72.     Broadridge also sent a letter to BetaNXT on December 1, 2022, informing BetaNXT that Schaffer was bound by restrictive covenants prohibiting him from working at BetaNXT in a capacity which is the same or similar to any capacity in which he was involved during the last two years of his employment by Broadridge.  A true copy of Broadridge's December 1, 2022 letter to BetaNXT, and a responding letter from BetaNXT, dated December 21, 2022, are attached as Exhibit 8.

73.     Broadridge requested that BetaNXT respond to the letter no later than December 5, 2022.

74.     On December 5, 2022, upon learning that Schaffer had commenced employment with BetaNXT on November 28, 2022, Broadridge sent a follow-up communication to BetaNXT seeking to discuss the matter later that afternoon.

75.     Thereafter, the parties and BetaNXT engaged in, ultimately unsuccessful, discussions aimed at resolving the matter, without aid of the Court, including a demand made by Broadridge on December 13, 2022 and a counter-offer made through BetaNXT's counsel on December 15, 2022.

**E.     Broadridge's Injuries**

76.     By disregarding his restrictive covenants and seeking to commence employment with a direct competitor in a similar position to the one he most recently held at Broadridge, Schaffer has placed Broadridge in an untenable position.  Relief is now essential to protect Broadridge's valuable confidential and proprietary information as well as its customer relationships.

77.     As a result of Schaffer's intimate knowledge and access to information concerning Broadridge's strategies, especially concerning pricing and pricing strategies related to Broadridge's Wealth Management Advisor Platform—the very platform where BetaNXT competes with Broadridge—it is unavoidable and inevitable that Schaffer will use his vast knowledge of Broadridge's confidential and proprietary information in his new position at BetaNXT.

78.     Should Schaffer be permitted to continue employment at BetaNXT in his current position, he will do so armed with the strategic pricing strategies and other highly confidential information related to Broadridge's products while working for a competitor that is in the same

field as Broadridge.  In the process, by employing Schaffer, BetaNXT will usurp the substantial time and resources Broadridge invested in developing its pricing strategies and maintaining its customer relationships.

79.     At the present time, Broadridge and BetaNXT compete fairly in a competitive market, but if Schaffer is allowed to continue his employment with BetaNXT in his current position, it will provide BetaNXT an advanced knowledge of Broadridge's overall strategy, and therefore give BetaNXT an unfair advantage for control of the wealth management services market.

80.     Broadridge will suffer irreparable harm if Schaffer is allowed to begin employment with BetaNXT because, in addition to all of the confidential pricing information and strategies Schaffer had access, he was also given access to, and has intimate knowledge of, Broadridge's GTO business, as well as the technical roadmap for Broadridge's products, confidential client lists, and prospect lists.

81.     In the hands of a competitor, such as BetaNXT, Schaffer will disclose or use such information to enable BetaNXT to outbid Broadridge on any pricing proposals.

82.     Broadridge will suffer irreparable harm because Schaffer, as an employee of BetaNXT in a similar position to the one he most recently held at Broadridge, would use the confidential pricing information and pricing strategies he learned while an employee of Broadridge to unfairly compete with Broadridge on behalf of BetaNXT.

83.     Broadridge cannot estimate with any degree of certainty the nature and extent of its potential damages to be incurred as a direct consequence of Schaffer's breach of his continuing obligations to Broadridge. As such, the damages and injuries threatened by reason of the

intentional actions of Scahffer are irreparable and Broadridge has no adequate remedy at law to protect itself from Schaffer's wrongful activities.

84.     Indeed, when Schaffer executed the RSU Agreement, he acknowledged that "a violation of the foregoing covenants not to compete, not to disclose, not to solicit, and not to hire will cause irreparable injury to Broadridge.  Broadridge shall be entitled, in addition to any other rights and remedies it may have at law or in equity, to an injunction enjoining and restraining me from performing, and continuing in the performance of, any such violation." *See* Exhibit 1, at ¶ 6.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

85.     Broadridge repeats and realleges the allegations in preceding paragraphs of this Complaint as if set forth fully herein.

86.     The RSU Agreements are valid, enforceable contracts entered into between Broadridge and Schaffer.

87.     Broadridge has performed all of its duties and obligations under the RSU Agreement.

88.     Schaffer has materially breached the RSU Agreement by commencing competitive employment with BetaNXT in a similar position to the position he most recently held at Broadridge prior to the expiration of the non-compete period set forth in the RSU Agreement.  (*See* Exhibits 1, 2).

89.     Schaffer's breach of contract has caused, and will continue to cause, Broadridge to suffer substantial injury that cannot be calculated, and irreparable harm to its business as he specifically acknowledged and agreed.

## SECOND CAUSE OF ACTION

### (Unfair Competition)

90.     Broadridge repeats and realleges the allegations in preceding paragraphs of this Complaint as if set forth fully herein.

91.     Schaffer's use of Broadridge's confidential information, including but not limited to its pricing information and strategies, will allow Schaffer (and BetaNXT) to build and expand BetaNXT's sales using knowledge, trade secrets, and confidential and proprietary information gained from Broadridge.

92.     By virtue of the foregoing, Schaffer has engaged in unfair competition and will continue to compete unfairly with Broadridge if he is permitted to remain employed by BetaNXT in a position that is similar to the position he most recently held at Broadridge.

93.     The acts of unfair competition include Scahffer's use, and threatened use, of Broadridge's confidential and proprietary information to unfairly compete with Broadridge and to the detriment of Broadridge.

94.     As a result of Schaffer's unfair competition, Broadridge has been and continues to be irreparably harmed.

95.     Schaffer's unfair competition has caused, and will continue to cause Broadridge to suffer substantial injury that cannot be calculated, and irreparable harm to its business, reputation, and goodwill.

96.     **WHEREFORE**, plaintiff Broadridge respectfully demands that this Court enjoin Schaffer from continuing the unlawful activities described above, and that this Court issue judgment as follows:

1.   Temporarily restraining Schaffer from engaging in any conduct in violation of the RSU Agreement and the Restrictive Covenant, including (without

limitation): (i) a prohibition against Schaffer competing against Broadridge in the same or similar position he held during the last two years of employment at Broadridge; (ii) Schaffer's use of Broadridge's confidential information; and (iii) the solicitation of Broadridge's customers or employees in violation of the RSU Agreement;

2. Preliminarily and permanently enjoining Schaffer from engaging in any conduct in violation of the RSU Agreement and the Restrictive Covenant, including (without limitation): (i) a prohibition against Schaffer competing against Broadridge in the same or similar position he held during the last two years of employment at Broadridge; (ii) Schaffer's use of Broadridge's confidential information; and (iii) the solicitation of Broadridge's customers or employees in violation of the RSU Agreement; and

3. Granting Broadridge such other and further relief as is just and proper.

Dated: New York, New York
       December 22, 2022

Respectfully submitted,

EPSTEIN BECKER & GREEN, P.C.

By: /s *Daniel R. Levy*
    Daniel R. Levy
    Daniel J. Green
875 Third Avenue
New York, New York 10022
Telephone: (212) 351-4500
*Attorneys for Plaintiff*

<u>**VERIFICATION**</u>

I, Matthew Connor hereby certify and verify as follows:

1.     I am the Chief Operating Officer within Broadridge Financial Solutions, Inc.'s ("Broadridge") Global Technology and Operations business.

2.     I have read the Verified Complaint and verify that the allegations asserted therein are true to the best of my knowledge, information and belief.

3.     This verification is based on my personal knowledge and review of the records kept in the ordinary course of business.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: December 22, 2022

Matthew Connor